Our next case of the day is Kaur v. Warden, and the first person we will hear from, take a moment to get settled, it's not a rush, Mr. Collins. Good morning, your honor. Kevin Collins on behalf of Ms. Kaur, as in automobile. Automobile. Thank you for that clarification. Joined by my colleagues Cody Reeves and Elizabeth Hall in the first row. Without them I wouldn't be here. This case presents an important question of constitutional significance. Did the government violate Raminder Kaur's Sixth Amendment right to counsel when the government acquired her privileged communications during post-trial proceedings and then retried her using those communications? Weatherford v. Bercy is the Supreme Court decision that supplies the clearly established federal law for purposes of habeas relief in this case. Okay. So despite the fact that all kinds of Fourth Circuit decisions are all over your brief, do you now acknowledge that the Supreme Court has repeatedly said that circuit precedent is utterly irrelevant to the clearly established inquiry? I think... Would you like me to quote some Supreme Court cases that say we can't consider circuit precedent deciding what's clearly established federal law under EDPA? Well, I guess what I would rely on is the Supreme Court's case from last week, Andrew versus White, that said basically if there's something critical to a Supreme Court case holding... Yeah, they said something critical to a Supreme Court decision, not something critical to a previous Tenth Circuit decision. No, but fair enough. But Weatherford v. Bercy recognized that the Sixth Amendment right to counsel includes the right to private privileged communications. Can I just get a clear answer on the question of do you agree that we are not allowed to consider the Fourth Circuit's elaboration on what Weatherford means? I don't think it's binding. I think it can be precise. Would you like... I'm going to start quoting. The Supreme Court says we have repeatedly pointed out that circuit precedent does not constitute clearly established federal law, Kerman versus Cuerra, 2017, per curiam. Fair enough, Your Honor. I'll concede that, but the point is... But the problem is your brief asks us to apply a test that is only in previous Fourth Circuit decisions. I respectfully disagree, Your Honor. I think Weatherford v. Bercy sets forth a clear test on when the government intrudes on privileged communications and then retries or uses a subsequent proceeding and they use those communications. Does it violate the Sixth Amendment right to counsel? They relied on the fact that in Weatherford v. Bercy there was no communication between the agent or the informant to the prosecutors. Here it's just the opposite. The prosecutors in this case purposefully subpoenaed... What do I do about the words if anything in Weatherford? Weatherford doesn't even hold that would violate the Sixth Amendment. Weatherford says if anything it would violate the Sixth Amendment to do this and then it says that's not what happened in Weatherford. Your Honor, I respectfully disagree. The words if anything aren't in that quote? I'm sorry, Your Honor. The language that you repeatedly quote from Weatherford is preceded by the words if anything is to be inferred from these two cases with respect to the right to counsel, it is comma. Sure, but... If anything is doing some work, it's not even clear it does that. Your Honor, I respectfully disagree. Weatherford v. Bercy involved the Sixth Amendment right to counsel and Weatherford was violated. They said it wasn't violated because the communication wasn't conveyed. The privileged communication wasn't conveyed to the prosecutors. Here it's just the opposite. In my view, it's no different than Andrew v. White where they looked at an Eighth Amendment case and said, well, we relied on the due process clause there as a backstop on inadmissible prejudicial evidence. In Andrew v. White, we submitted a 28-J letter on it this week. That supplies the rationale to apply Weatherford in this case. Why do we even need to get into Weatherford? The state appellate court assumed there's a Sixth Amendment violation. So that just leaves us with the question of the prejudice analysis to review. Isn't that right? Well, I think this habeas case, I think Weatherford applies, but I also think that this appeal turns on whether there was the prosecution's access to the defense file resulted in prejudice to Raminder Kaur or some benefit to the state. So let's talk about the prejudice. Okay. So there's three points of prejudice or benefit to the state because of their access. Number one, the Court of Special Appeals decision that's applicable and that we're discussing here made in a finding that there was no change in the trial theory or strategy between the two trials. That is objectively unreasonable and under 2254 should be disregarded. The second point is that the second WIG offered no support to the state's case but significant support to Ms. Kaur's. Both conclusions are plainly wrong. The third point is that there was no prejudice for Raminder Kaur not testifying and it became moot because there was no proffer. Let me take each of those in order. In terms of the state's theory. Can you first tell us what the standard is for reviewing the prejudice question? I think it's de novo. Where do we find that? Well, it's de novo. You review the district court's decision de novo. Right, but did it need to be… Lose the burden on what's the formulation. So, yeah, what is the legal… Before we can answer whether the prejudice inquiry is satisfied, what is the correct question for the prejudice analysis in your view? The correct question is whether we have shown that the state court's decision is an unreasonable application. Has an unreasonable finding a fact or an unreasonable application? No, no, so let's go back to… Pretend we're the Maryland Court of Special Appeals and we've just said we're going to grant your assumption that there was a sixth time violation. Now we have to conduct a prejudice analysis. But before I can conduct a prejudice analysis, I have to know what is the question under the prejudice analysis. So what do you believe is the question? The question is was the defendant prejudiced by their access and use of that communication at the second trial or second proceeding or did the state benefit? Who's the burden on? The burden is on the defendant, and I believe that… So you think when the Maryland Court of Special Appeals said the burden's on the defendant, that was not contrary to or an unreasonable application of federal law? No, but… When they said that was the question. Correct, but I do think… One more question. When they said the standard is whether you've shown a reasonable… They said reasonable probability. That's the language they used, right? Do you believe that was the correct formulation of the prejudice inquiry? Whether the defendant has shown there is a reasonable probability that this would have changed the outcome. I don't know if there's a difference between reasonable probability or an objectively unreasonable finding of fact. To me, there's unreasonable… I'm not talking about the standards for federal habeas review. I'm talking about the legal standards the state court was supposed to apply in conducting the prejudice inquiry. Well, the state court wasn't applying whether for… I am asking you about the prejudice question. They just said, has Raminder Kaur shown prejudice? No. They said, has she shown there is a reasonable probability? And all I'm asking is, do you take issue with that formulation of the legal standard? I think that standard is fine because regardless of how you characterize it, Raminder Kaur was prejudiced by the state's access to the privileged information in three different ways. Number one, the state made this finding that the state's theory didn't change between trials. What was really important for this court to consider and the Court of Special Appeals ignored was that Raminder Kaur was charged with murder, conspiracy with her husband to commit murder, and the use of a handgun. Everybody just focused on the murder. But the state's theory changed dramatically between the two trials. In Trial 1, at Joint Appendix 2613, they describe Raminder Kaur as the shooter. Joint Appendix 2624, she's the one who actually fired the shots to kill Priya Gabba. 2625, she was the one shot down in the street by Raminder Kaur. They treat her as the principal and the shooter in the first degree in Trial 1, and it continued into their closing. Now, fast forward. Between the two trials, the state gets all this access to this privileged information, including information that her husband had confessed to her, and had basically accepted responsibility for dressing up as a woman, dousing her with medication, and then shooting her, shooting his ex-wife. So the state, in Case 2, then tries the case as basically an accomplice liability case against Raminder Kaur. And it's most clear when you look at what they said in their opening and closing. Joint Appendix 3016, this is the prosecutor, Mary Beth Ayers, and when I say throughout the trial, they, you will see evidence that this isn't just one of them. This case is about both of them. The state then repeatedly weaves throughout the second trial this idea of the second wig from Performance Studios. They bring a separate witness from Performance Studios because they have access to the privileged information. They then weave this theme of two wigs, two jackets, two guns. Joint Appendix 3030 to 3031, in the opening, ladies and gentlemen, this is a murder planned and prepared by two people and made to happen by two people. It's not just one person. It may be Baldeo, Tanaj's ex-wife. It may be his court case, but she's absolutely 100% invested in it. So throughout this second case, it's not about Raminder Kaur shooting. So the Court of Special Appeals finding that the case had the same exact trial theory is wrong, plainly wrong. So you're saying that if the prosecution did not have access to this information, then there's a reasonable probability that the outcome would have been different. Is that your argument? It is, Your Honor, very much so. And you have three reasons why it would have been different. Well, because number one, one of the points of prejudice is Raminder Kaur was intimidated from testifying in court, and that was because she stood for two days of cross-examination on the new trial. That's one point. The second point is this second wig that was very prominent in the second trial, two wigs, two jackets, two guns. That wouldn't have been part of the State's second case. And then the second case focused on accomplice liability, both in opening and closing. The Court of Special Appeals said there was no change in theory. There was a dramatic change in theory. Can we go back to the proffer? So what the Court of Appeals said on the proffer, they said there has been no proffer. This is the Maryland Court of Special Appeals at 4452 of the J. They say there was, quote, no proffer of what Ms. Kaur's direct testimony would have been at the second trial, so her bald assertion was nothing more than an invitation to presume prejudice. I think that's an objectively unreasonable fact. Ms. Kaur, as part of her motion for a new trial, and I see a minute on my rebuttal time, I think. Well, we're not going to cut you off, don't worry. This is an important case with a lot of issues. Thank you for raising it, but I'm not going to cut you off. So Ms. Kaur, as part of her number one, she filed an affidavit with her lawyer that talked about the testimony. Filed where and with whom? Pardon me? Filed that affidavit where and with whom? It was filed in the circuit court in the motion for a new trial. Okay, but here's the problem. In your reply brief, you said that laid out. So you say in your reply brief at page seven that that affidavit laid it out. Where did you raise before the Maryland Court of Special Appeals? Because this is AEDPA. We're not deciding this case, what we think the right answer is. We're deciding whether the state court violated AEDPA or transgressed the limits set by AEDPA. Where in your client's Maryland Court of Special Appeals brief did you argue this affidavit constitutes a proffer of what she would testify to at the second trial? I mean, the affidavit was all over the Court of Special Appeals. That's not what I'm asking you. I'm asking you where did you say this is a proffer of what she would have said at the second trial? Well, what she would have said in the second trial, she also testified to at the motion for the new trial, and that's throughout the appendix. But she got the new trial. I understand. But, Your Honor, also the trial court summarized her testimony in ruling on the motion for a new trial. I would direct the court to that. But she got the new trial. That's not a proffer of what she would testify to at trial one. That's a proffer of what she would have testified to at trial one had she not been intimate. Why would there be any difference between what she would have testified to in the affidavit, in her testimony for a new trial, and if you look at the trial court's… Am I correct in surmising from your refusal repeatedly to answer my straightforward question that it is true that nowhere in your Maryland Court of Special Appeals brief did you ever claim that that was a proffer of what she would have testified to at trial two? I have read your brief. I do not see anywhere in your brief where you said that before the Maryland Court of Special Appeals, and I'm giving you an opportunity to tell me where in the brief and not it's all over the brief. No, Your Honor, you're right. There's not something called a proffer in the Court of Special Appeals brief, but what is replete throughout the record, her affidavit, her trial testimony, and I would direct, again, Your Honor's attention to Joint Appendix 1547 to 1549. It's the trial court's summary at the motion for a new trial as to what her testimony would have been. She's on record with an affidavit. She testified to it. The trial court summarizes it. And the idea that that wouldn't have helped at the second trial… I don't care what you told the circuit court. I told you what you told the Court of Special Appeals whose decision we're deciding whether to defer to under AEDPA. I understand, Your Honor, but the Court of Special Appeals acknowledged the affidavit was there and basically ignored what her proffer would have been had it actually been made. I mean she testified to it under oath for a course of a day and a half. In any event, Your Honor, I see I'm in my rebuttal. Can you address the court deferred ruling until she decided to testify? And so you talk about this prejudice as far as she had to make some decision whether or not to testify not knowing what the court's ruling would be on what would be permitted to come in as impeachment. And so I'd like you to address why you think that was error and what the prejudice was to her. So at Joint Appendix 4233, her trial counsel stood up when it was clear that she wasn't going to testify at the second trial. There was a brief colloquy as to why you're not going to testify. Her trial counsel stood up and said, based on the various motions for the protective order, not recusing the prosecutors, the motion in limine and the state's access to the privileged materials, that was part of the defense's calculus and Ms. Carr's decision not to testify in that case. That remedial order was a prayer, and without knowing what the state was going to be able to ask her, she decided that she was not comfortable testifying. The idea of what she was going to testify to was replete throughout the record. I know there's no express proffer in the Court of Special Appeals, but it was in her affidavit, in the motion for a new trial testimony, and in the judge's summary of it. So Weatherford doesn't look at these remedial orders. Weatherford looks at, was there an invasion of the attorney-client privilege, and did the state benefit or did the defendant, did she suffer any prejudice? Those two are sort of corollaries. Did the state benefit or did she suffer prejudice? In this case, there's three basic problems with the state's access. Scared her off the stand, they got access to this second wig that they weaved throughout the course of their trial, and then they took into account what her likely testimony would have been, which was that her husband did the shooting, and that's why they shaped their trial testimony to be different from trial two from trial one. So respectfully, I would ask the Court to reverse the Court's opinion. I have a couple of questions. Judge Berner, do you have any questions? I have a question about remedy. The last sentence of your brief says, the writ should issue. Can a federal court order habeas relief to someone that no court has actually found suffered a constitutional violation? I think if that's what the brief says, I would ask the Court to reverse the district court's decision. And remand, because Judge Berner pointed out earlier, the Maryland Court of Special Appeals did not find the Sixth Amendment was violated here. It assumed it was, right? It did. So even if you're right on prejudice, wouldn't the district court on remand have to actually decide there was a Sixth Amendment violation? No, because I think— You can grant habeas relief to someone who no court has found is actually the victim of a Sixth Amendment violation? No. This court's review of the district court's decision is de novo, and I think that this court can reverse the district court's decision. Well, then you're saying we should find there was actually a Sixth Amendment violation? I do. On this record, Your Honor, I think the President— But you agree we would have to do that. We cannot grant habeas relief based on the assumption that someone's Sixth Amendment rights were violated. No, but I think you could remand with orders to enter additional orders consistent with this court's opinion. I think this court should reverse the district court's decision on a de novo review. OK, so you are agreeing we can't just grant habeas relief based on the assumption her Sixth Amendment rights were violated? No, but I think there can be a conclusion from this court that guides the district court's further proceedings. Thank you, Your Honor. Thank you. Mr. Welter, is that correct? That is correct, Your Honor. Good morning, Your Honors. May it please the Court?  In this case, the district court correctly applied the highly deferential standard of review to the decision of the Maryland Court of Special Appeals to reject Ms. Carr's claim. And this court, we submit, should do the same. As the court's conversation with my colleague has illuminated, I think, and as we submit in our brief, I think this really does come down to the question of prejudice because that's the ground or the lack of prejudice on which the Court of Special Appeals ruling was based. The court otherwise made a series of arguendo assumptions in Ms. Carr's favor, but ultimately ruled that she bore the burden to prove prejudice resulting from any putative error in the trial court not disqualifying the prosecutors. And I hear my friend, too, concede now before this court that they're not challenging that the burden was on her. And then that upon its independent review of the record, she failed to meet that burden. And we submit that that ruling was not an unreasonable application of any clearly established federal law, nor was it an assessment of the record that was wrong beyond fair-minded disagreement. Can I – well, let's go to the proffer point that I was talking about with your colleague. They say, correctly, that the affidavit was before the Maryland Court of Special Appeals. They say that it was before them. It was part of the record. It was referenced in the brief. It's even actually referenced in the Court of Appeals opinion, the Court of Special Appeals opinion. So how can they say there was no proffer when – you know his argument. What is your response to the – it was, in fact, before them, so I don't know how the Maryland Court of Special Appeals concluded there was no proffer. Well, I certainly don't dispute that it was both before the circuit court and before the Court of Special Appeals. It was in – I mean it was the filing of that affidavit with the motion for new trial that set the proceedings that led to the second trial in motion. But it was – but it certainly was not a proffer and it was not presented to the court as a proffer of what – either what she intended to testify to at the second trial at which her counsel, in fact, specifically disclaimed making a proffer expressly. And it also – nor was it a proffer, and I think this is perhaps even more critical, of in what way she was inhibited from testifying to those things by the state's accession. She didn't – I want to go back to the point that I raised before, which is how can she truly retain the right to testify without knowing in what way her previous testimony can be used against her? Yes. Thank you, Your Honor, and I'm very glad you responded to that. So the – what the court – what the trial court reserved on was very narrow. Does it matter? I mean there's a reservation, so she doesn't know, and so even if it's only on a small subset of topics or – does it matter? Well, I think it does, and let me explain why. If you look – and this is on pages 1570 to 1571 of the joint appendix, which is where the trial court makes its ruling. It says that the state is prohibited from making any use of any attorney-client communication between the defendant and her attorney, as well as making any use of the affidavit. That's the one that was submitted with the motion for new trial that was filed in this case. This would include any testimony relating to any attorney-client communication that the defendant or her attorney produced at the hearing. What the court is reserving on, and it would be – I'm now quoting again – only for impeachment purposes, if at all, is the testimony of any other witness or the testimony that the defendant may have given unrelated to any attorney-client communication. So the only thing that the court reserved on the possibility of the state using for impeachment was matter that was outside the attorney-client privilege. So the whole issue of – the state was not allowed to use her privileged matter at all. Can I just ask on the – do you have a follow-up? With all respect to the state trial court judge, what in the world does it mean to tell someone you can't use things that you know? I don't even understand how that works. There's lots of topics I know lots of things about, and you say, don't use that. I don't know what that means. I guess what it clearly means is, dear God, don't reference it. I was reading your affidavit the other day, and I quoted it when it said this, but how can a human being who knows things not use those things when they're doing something that's directly related to the thing they're being told to not use them in? What does that even mean? I mean I think that is something that it's probably very difficult for lay jurors to do. I think it's something that judges – ignore everything you know and try this case as if you don't know what – for example, take the affidavit. Here's this affidavit that basically says what the defendant's account is going to be. When you're preparing to cross-examine the defendant, don't make any use of that, including don't anticipate that these are the things she's probably going to say on the stand because she's already told someone these are the things she would be saying on the stand. And don't think about lines of cross-examination if she says those things. Well, what the – And don't go looking for evidence that would conflict with the things that I think she might say on the stand. The prosecutor and the trial court had an interesting colloquy about this, and I apologize. I'm not going to be able to give you an exact JA site, but it's in this discussion. It's probably a few pages earlier than the one I just referenced where the prosecutor pointed out. There was a – for instance, there was a statement that she had given to police that was held to be Miranda violative. So in exactly the same way, that couldn't be introduced in the state's case-in-chief, but it was held voluntary, so it could have been used for impeachment. But we don't tell prosecutors when we suppress – that's a good example. When we suppress Senator Miranda, we say you cannot use this statement, but we don't tell them, like, try to forget that you know what she said during that statement because we recognize that would be impossible to tell them that. We just say, like, you can't use the statement. The statement's not usable, but that doesn't mean try to forget about it and don't make use of it. And although there was an un-Miranda-ized interrogation where the defendant said his alibi is X, I don't think we tell the prosecutors you can't go look and see if that alibi is true or not because he's probably, if he takes the stand, going to assert that alibi again. We don't tell them that because it's probably impossible to tell them that is, like, the way that human beings work, right? I just don't know what don't use it means. I mean, I don't – I think – I mean, the court, I think, gave – it gave an oral ruling on this, and that is what it says and said, and I don't think that there was – no one asked for clarification of that ruling in terms of what it meant, what it required of the prosecutor. And there was then a subsequent ruling where the court went one better than what defense requested and said the trial prosecutor was not even able to refer to even a redacted transcript of what – Yeah, no, I get that. You can't use it. You can't – so for example, you can't introduce it in evidence during your case in chief. Broadly speaking, I guess if she gets on the stand, you can't say, isn't it true you previously told someone else X, right? You can't do that. But that's not – that's saying you can't introduce it, not the prosecutors can't use it. That's the part that's just perplexing me. I don't even know what that means. Well, I guess I – other than to cross-examine the defendant with it or put something into evidence. Or to anticipate likely defenses at trial and formulate your state's case to anticipatorily rebut what you think are likely to be defenses at trial. Or to change the state's case altogether. And actually, that gets to my question about your colleague's three different ways in which he states his client was prejudiced. My question is whether we should be looking at those three different ways in isolation to determine prejudice or whether we look at them cumulatively. In other words, he says she was prejudiced because she couldn't get on the stand. He was prejudiced – she was prejudiced because there was a new prosecution theory after knowing the evidence from the first trial. She was prejudiced because – I think the third reason was because of the use of the wigs and the accomplice liability theory. I think two and three probably collapsed to be one. But in any event, my question is whether we are to look at each – all of those together and determine whether there was – whether the defendant was prejudiced by allowing the prosecutors to stay on for the second trial because of that together. Or do we look at the theories in isolation? Because I'm not sure any one theory would be necessarily enough, but I think together they may well be enough. Well, I think in the first instance the question is how should the state appellate court have viewed that? And would it have been a violation of clearly established – a misapplication of clearly established federal law for the state appellate court to review it in a way other than what they did? Well, the court assumed that there was a clearly established law, so just speaking on the prejudice issue. Yes. That's my question is do we look in isolation at each of the things that the prosecution presumably did differently or do we look at them as a whole? I'm inclined to think we look at them as a whole. I don't disagree with that. I think that the court of special appeals looked at them as a whole. I mean it analyzed them, of course, each as well, but it ultimately concluded that Ms. Carr had not shown prejudice. And what – to conclude otherwise in the context of AEDPA review, this court would have to not simply disagree. This court would have to say that no fair-minded jurist could reach that conclusion. So can we take three to those and make sure I have a sense of what the Maryland Court of Special Appeals said about each of them? So on those she would have testified differently, they reject that one on the grounds of no proper proffer. That's their grounds there, right? Yes, and essentially that is effectively asking them to presume prejudice. So they essentially say that is no showing. Absent a proffer, that doesn't add anything to the prejudice analysis. On changing their theory, as I recall, they said basically that there's – we conclude they didn't change their theory. Now that's right or wrong, but that was their explanation of the changing their theory issue, right? Yes. And then – They rejected that on the – Could you walk me – the one – I don't mean this. This is a sincere question. What is their theory of rejecting the Whigs? That was the one that was less clear to me. Like on what basis did the Maryland Court of Special Appeals conclude the Whigs issue was not a prejudice problem? So the basis on which the Court of Special Appeals concluded that the Whigs were not a prejudice problem was that in fact Ms. Carr used the introduction of the second Whig and in fact she – not she personally, her defense – was the source of much of the evidence about the second Whig and used it to advance her theory of the case, which was that not she, but Mr. Taneja was the shooter, her husband, and then also that she was unaware of all of this. But of course to clear that hurdle, she has to first generate a reasonable doubt that she is the shooter. And I think they are sort of interrelated in that the state's theory did not change between the two trials. If you look at JA 4258, which is the start of the prosecutor's closing argument in the second trial. If you look at JA 4384, which is the rebuttal close, the state argued and listed all the ways – Sorry. How is she the source of the Whig when the – unless Maryland procedure is radically different than I understand it to be. The first thing that happens at a criminal trial is the prosecution opens, right? Didn't the prosecution bring up the Whigs thing during its opening statement? So how can you say she's the one who introduced the second Whig issue? The government in its opening statement referenced the two Whigs, right? Yes, yes. I don't disagree with that. So it's not accurate to say that she's the one who injected the two Whigs thing into the second trial. The government injected the two Whigs thing into the second trial, right? Well, I agree – The first time the jury heard the words two Whigs was from the government, right? That is correct, yes. What I'm referring to, if you look – and this is beginning at page 3875 of the Joint Appendix, which is the testimony about the Whig from Mr. Tubbs, who's the employee of the performance studio store where it was purchased. And it is, in fact – it comes out that the defense investigator met with him. They managed to obtain another Whig like that because the actual second Whig was not found. But they got an exemplar that's introduced through him, and that was provided by the defense. They went through his receipts to find the receipt for the purchase of the second Whig or what they alleged to be. The state actually fought them on introduction of that. And the reason that they introduced that receipt was to show that the second Whig was purchased or what the Whig that was purchased on this second receipt was also purchased with prosthetic disguise and makeup. And the purpose of all of this was to establish what was the defendant's theory of the case. So it sounds like she was making – or her counselor was making the best of a bad situation, that the evidence of the second Whig was introduced. They needed to defend the case, and so they figured out a theory that would be the best possible theory to defend the case. But that doesn't say she was the one or her counselor was the one introducing the second Whig. And the second Whig was clearly relied on by the prosecution in the case. I mean, it's all over the closing argument. It's all – that's what they – the Whigs. Why are there two Whigs in the car? Ladies and gentlemen, why are there two Whigs? Over and over again, there were two guns, two Whigs, two jackets. One Whig is missing. That was a change in the theory. I don't know that it was a change in the theory. It was a change in the argument. Fair. Change in the argument. But how else did you – I mean the issue is it seems like by the second trial, it's clear that really what you need to do is tie her to the crime. And this second Whig, two guns, I mean that's very strong evidence. That's what you're pointing to to say this is how you know she was involved. And you didn't have that in the first trial. I mean I think that's the real concern is how do you link her into it? Well, the state's theory to link her into it at the first trial as at the second trial was always that she was the shooter at both trials. And then as a backup, but even if you conclude that he was the shooter, she's an accomplice. But first and foremost, that she was the shooter. And, of course, the defendant – I mean the Whig presents an interesting choice for the defendant because they have to establish reasonable doubt that she's the shooter. If she's the shooter, that's the ballgame. And so they're establishing that – and the Whig evidence helps them establish that Mr. Taneja is the shooter. Now, they also need there to be reasonable doubt that she's an accomplice, and there was ample evidence to show her accomplice liability. There was ample evidence to show that she was the shooter. Fundamentally, we would submit that the Court of Special Appeals of Maryland looked at this. It compared the records of the two trials, and it came to the conclusion that there was not a reasonable possibility of prejudice to Ms. Carr. But I guess on the Whigs thing, I'm still sort of struggling to see why they concluded that because – okay, so let me give you the formulation of the argument that I think they make or that I think is the strongest formulation of the argument, which is to say they said the second Whig has no impact on the second trial. Okay, but every single eyewitness, as I understand it in this case, identifies the shooter as a woman. Now, that's really bad if I'm representing Ms. Carr because she's a woman and because the other person – sort of the elephant in the room – I mean her whole theory, the other elephant in the room, is that the other person who's certainly involved in this crime is not a woman. And so the fact that all the witnesses identify the shooter as a woman is a real problem for the defense. And so with just one Whig, though, if I'm defense counsel, I could say, oh, sorry, that's easy. People don't want to get caught, so her husband disguised himself as a woman. Whether that's plausible or not, I don't know, but you could try to do that if you're the state. The problem is two Whigs makes that harder, though, right? Because two Whigs, two guns. So why, in your view, is that not a prejudice problem, and how do you conclude that it isn't? Well, because – It takes away – while there would be an available argument, I can answer the question of why all the witnesses identify the shooter as a woman because my hypothesis is that my husband was wearing a wig, and it was happening fast, and the witnesses just saw shooting, and that's really traumatic, and so they could have mistaken a man wearing a wig for a woman. I see that my time is about to expire. Of course, I'm going to answer – if I may afterwards, I would like to make one additional point. Sure, absolutely. The – I don't dispute that the prosecutor – it has a nice cadence to it, two guns, two Whigs, two jackets. But the addition of the evidence about this particular wig, the particular missing second wig, including the purchase of it from the performance studio store with a prosthetic and with makeup, significantly helped Ms. Carr's case to show that Taneja was the shooter, which was a critical aspect of her defense. And so the Court of Special Appeal – How did it help? Just walk – I'm sorry. I may be just not – how did that help her defense, in your view? Because if she's the shooter, and every eyewitness says that the shooter's a woman, if she's the shooter, she's guilty. No, no. I'm sorry. I get that. How does this stuff that you just listed help her defense, in your view? Because they – What does it let her argue that she could not otherwise argue? So the defense established through Mr. Tubbs' testimony that this was – this particular wig was the kind of wig to be worn by a man. They established – they would submit that it was purchased along with a prosthetic and makeup. And that supports their theory that, instead, the shooter was Mr. Taneja, disguising himself as a woman. Then, of course, they've still got the problem that they need to generate reasonable doubt of accomplice liability. And just – let's say, I think, the last question on this topic. Because at the first trial, there was evidence of a wig. It's just the difference of the first – And the idea is that the second wig that's only mentioned at the second trial, that is a type of wig that can only be worn by a man? Or was the type of wig that was mentioned at the first trial also a type of wig that could legitimately be worn by a man? No. There wasn't even that much testimony even about the first wig at the first trial to describe it. It was apparently purchased at a CVS. It's a separate purchase. But there was a lot of testimony – I shouldn't say a lot, but there was testimony specifically about that the second wig was intended to be worn by a man. So it's a Halloween costume that says, can be worn by a man? Isn't that the problem? I think – it's a little bit unclear, but as I read the transcript, there's like a packaging photo of it being worn by a man. And Mr. Tubbs describes it as popular for people who want to do like an Ozzy Osbourne costume. So that maybe gives you an idea of what the wig looked like. So that was the testimony, and that is what the Court of Special Appeals relied on. And we submit that that is a view of the record that was not unreasonable and withstands EdPub review. You said you had a point you wanted to wrap up on? I did. Go ahead. Thank you. I thank you for that. And the point is this, just to respond to your question about remedy, if you were to conclude otherwise. We do think that the appropriate thing would be to remand it to the district court because if this were going to be reviewed not under EdPub review but de novo, none of those assumptions that the Court of Special Appeals made have been briefed to this court. They weren't briefed to the district court. They need to be resolved, and many of them are contested. Thank you. I thank you. Okay. Mr. Collins, you have some rebuttal time? I'll be brief, Your Honor. You've got five minutes. Or pending questions. You've got at least five minutes, no fewer than five minutes. Thank you, Your Honor. So a couple of things. Weatherford talks about whether there was any tainted evidence from use of the intrusion. And so it's not about whether it was a reasonable interpretation. The state changed its theory of the case. Trial one, she was- Wait, so you're now arguing that the state court's formulation of the prejudice inquiry was itself contrary to a clearly established federal law? I don't understand why you're quoting Weatherford. Well, I think the state court's- Just the point is there was argument from my colleague talking about, well, that was a reasonable interpretation of the evidence. Weatherford says, did they actually benefit, did the government benefit by getting access to this information? Did they change anything about their case? They changed the theory of the case. And this idea about two wigs, two guns, two jackets, that was the theme. That wasn't introduced by us. That was the theme of the second case because what the state was concerned about was between trial one and trial two, they got access to this entire defense file where it said there was tremendous evidence that her husband was the shooter and that she was going to testify. Now, she was scared in the not testifying, so that's why there's a slight difference between opening and closing in the second trial. Nevertheless, they leaned in on accomplice liability and conspiracy. So all this idea about, well, the wig helped remender Carr. It helped her maybe not being a principal in the first degree, but it said nothing about the conspiracy or accomplice liability. And that's what the government leaned into on the second trial. Again, Weatherford talks about whether there was purposeful intrusion. The state's attorney's office here, interestingly, hasn't been mentioned, and it wasn't mentioned in the court below. The court below mentioned footnote 13, there were several options to appoint other prosecutors. Joint appendix 2522 is part of the state's opposition to the protective order asking for a new trial team. The state's attorney's office has a separate unit within that office that does ineffective assistance to counsel claims. So these prosecutors in the state had these same trial lawyers. They have colleagues in that office to try these ineffective assistance to counsel claims. No, they went forward, so it was purposeful intrusion, and then the question just becomes, did they benefit by access to this privileged information, or did remender Carr suffer any detriment? That's what Weatherford says. It doesn't get into whether that's a reasonable explanation. They benefited. So I ask one more time. Are you saying the Maryland Court of Special Appeals formulation of the prejudice inquiry was contrary to a clearly established federal law? I think it was, Your Honor, and I don't know if my answer is the same. Your questions are difficult, and I'm trying to be honest. So most of the Court of Special Appeals opinion had to do with whether there was presumed prejudice from this access, and that's what most of the Court of Special Appeals opinion was about, based on various cases from all over. Should they presume prejudice based on this access? I'm saying you don't have to presume it. It exists. It exists because they changed their theory, Carr didn't testify, and the government is the one that introduced the second wig. Two wigs, two guns, two jackets. So can you answer the question that I asked your colleague? When I look at the Court of Special Appeals decision, it looks like they looked at each and every one of your theories separately and determined that there was not a reasonable probability that there would have been a different outcome if, for example, your client had been able to testify. And then the next step, is there a reasonable probability if, for example, the second wig hadn't been introduced? And then look to the third thing. Is there a reasonable probability had the prosecution not changed its theory, rather than looking at it as a whole? And so my question is, you came before us and you said there are three different things. Do we look at that as a whole, or do we look at those individually, like the Court of Special Appeals did? I think you could look at them individually and collectively. Individually, to the extent that the government benefited in any way, I think under Weatherford, it violates clearly established federal law. I mean, the test for prejudice and habeas under Breck is whether this constitutional error, which we think occurred, had a substantial and injurious effect on the jury's verdict. And you can't say that Raminder Kaur not testifying and not being able to point at her husband as the shooter and having dosed her with medication and dressed up as a woman wouldn't have affected the jury's verdict. Number one, the change in theory, the emphasis from her being the shooter to an accomplice, the idea that that didn't have any effect on the jury's verdict. The state benefited from this access to the defense file. They had choices to make. They should be held to the choice. They violated Kaur's constitutional rights. You know, the shame about this is Kaur had a story to tell in two different cases. She never told it, first because her lawyer was terrible, and secondly because of the government's intrusion into her privileged communications. Unless the Court has any further questions. Thank you very much. We'll thank both counsel for their arguments. We'll come down to Greek counsel and proceed into our last case of the day.
judges: Toby J. Heytens, Nicole G. Berner, Elizabeth W. Hanes